IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: ERIN R. KEMP, Debtor                                       No. 5:16-bk-70299
                                                                  Ch. 7

ERIN R. KEMP                                                      PLAINTIFF

v.                              5:17-ap-7027

U.S. DEPARTMENT OF EDUCATION                                      DEFENDANT

OPINION AND ORDER

Before the Court is the *Complaint to Discharge Student Loans* filed by the debtor on May 3, 2017, and the *Answer of Defendant United States Department of Education* filed on June 6, 2017. In her complaint, the debtor seeks a determination that the student loan debt that she owes to the U.S. Department of Education [DOE] is nondischargeable under 11 U.S.C. § 523(a)(8) because its payment would impose an undue hardship on the debtor. The Court heard the complaint and answer on November 16, 2017. Deborah Groom and Seth Creed appeared on behalf of the Department of Education and the debtor appeared personally and through her attorney, Forrest Stolzer. For the reasons stated below, the Court respectfully denies the debtor's complaint to discharge approximately $53,000 in student loan debt.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

Section 523(a)(8) provides that student loans are not discharged in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." To obtain a discharge of student loan debt, a debtor must

prove by a preponderance of the evidence that repayment constitutes an undue hardship. *Parker v. Gen. Revenue Corp.* (*In re Parker*), 328 B.R. 548, 552 (B.A.P. 8th Cir. 2005). Proving undue hardship requires more than a demonstration that it would be difficult for the debtor to repay the student loan. *Id.* at 553. The Eighth Circuit characterizes the debtor's burden under § 523(a)(8) as "rigorous." *Educ. Credit Mgmt. Corp. v. Jesperson* (*In re Jesperson*), 571 F.3d 775, 779 (8th Cir. 2009). For instance, the Eighth Circuit Bankruptcy Appellate Panel recently affirmed a bankruptcy court's ruling that a 66-year old debtor's student loan debt was nondischargeable despite the fact that the debtor was four years away from retirement and suffered from vision, hearing, and ankle problems. *Hurst v. S. Ark. Univ.* (*In re Hurst*), 553 B.R. 133 (B.A.P. 2016).

Because § 523(a)(8) does not define undue hardship, "courts have devised their own methods of determining whether an undue hardship exists." *Conway v. Nat'l Collegiate Trust* (*In re Conway*), 495 B.R. 416, 419 (B.A.P. 8th Cir. 2013). The Eighth Circuit employs a totality of the circumstances test that requires courts to evaluate a debtor's "past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and 'any other relevant facts and circumstances.'" *In re Jesperson,* 571 F.3d at 779 (quoting *Long v. Educ. Credit Mgmt. Corp.* (*In re Long*), 322 F.3d 549, 554 (8th Cir. 2003)).

To begin its totality analysis under *Jesperson*, the Court will first examine the debtor's past, present, and reasonably reliable future financial resources and her reasonable and necessary living expenses. The debtor in this case is 36 years old, divorced, and raising her 13-year old daughter. At trial, the debtor appeared intelligent, composed, pleasant, accomplished, and articulate–qualities that have undoubtedly contributed to the debtor's historical success in the workplace. The debtor began working part time at Arvest Bank when she was 18 years old and a senior in high school. After graduating high school in 1999, she continued to work for Arvest on a part-time basis while she attended college, which her parents were paying for at that time. After attending two semesters of college, the debtor left school to work full-time at Arvest. In 2007, the debtor decided to finish

2

her degree based on her knowledge that Arvest tended to promote employees with college degrees; she believed that she needed to complete her degree in order to advance at Arvest. To that end, the debtor continued her full-time employment with Arvest while attending online college classes through Ashford University. In October 2010, the debtor obtained her bachelor's degree in psychology with a minor in sociology. She financed her education at Ashford with the student loan that is at issue in this adversary proceeding.

During what ultimately became the debtor's 17-year tenure at Arvest, the debtor was repeatedly promoted and given regular raises. While the debtor was at Arvest, she had good insurance and a 401(k) retirement account to which Arvest contributed. The debtor was a good employee, as evidenced by her consistent advances–she started out as a part-time teller making $10.00 per hour and received successive promotions to positions including administrative assistant, credit manager, and assistant branch manager. In June 2012–less than two years after she received her bachelor's degree–the debtor was promoted to the position of branch manager. When she resigned from Arvest in 2015, she was still a branch manager and was earning a base salary of $45,000 per year plus bonuses–although the Court has no evidence regarding the amount or regularity of those bonuses. While employed at Arvest, the debtor made her student loan payment of $350 per month without apparent difficulty.

The debtor testified that she resigned from Arvest in June 2015 because the job became too stressful. She did not describe with any specificity the aspects of the job that became overwhelming, other than to say that her boss at the time was difficult to work for and was harder on the female managers than the male managers. She testified that she was diagnosed with anxiety and depression and was prescribed medications for those conditions by her general practitioner. She also testified that the stress from her job carried over into her personal life, making her short-tempered with her family in the evenings and resulting in her daughter, who was 11 at the time, becoming withdrawn. However, despite the fact that her home life was apparently impacted by her stressful job

at Arvest, the debtor testified that her work was never affected and that she left Arvest on good terms. In fact, she said that even now she could go back to work at Arvest but that she would have to start out at a lower position than the one she had when she resigned in 2015. At the time of her resignation from Arvest in June 2015, the debtor cashed out her 401(k) and received between $35,000 and $38,000 at the beginning of July 2015. She gave $16,000 of her 401(k) proceeds to her then-husband to buy a truck, which was then titled in his name. She also loaned $6000 to her adult stepson (now her ex-stepson) to buy a vehicle. The debtor testified that her stepson has never held a job for long and, although there is a written loan document of some variety obligating the stepson to repay the $6000 to the debtor, she knew when she loaned him the money that repayment was unlikely. The debtor said that she paid bills with the rest of her 401(k) proceeds, including a $3000 medical bill. At trial, she could not say which bills she paid or the amounts of those bills. She also testified that she allowed her husband to talk her into making poor decisions with the money. Without her income from Arvest, the debtor and her husband used the debtor's credit cards to supplement her husband's $30,000 per year income.

Eight months after she resigned from Arvest, the debtor filed her chapter 7 bankruptcy case. Around the same time, she began working part time at Lowe's, where she remains employed. She makes $13.46 per hour at Lowe's and testified that her hours vary. She nets between $250 and $600 per bi-weekly check, estimating that she averages around $400 per check. She is allowed to set her own hours at Lowe's because she works only part time. Although the debtor believes that Lowe's would hire her to work 38 hours per week–which is considered full-time at Lowe's–she chooses not to because she would not have the control over her schedule that she currently enjoys and would not be able to spend as much time with her daughter or run errands for her ailing father.

The debtor has health, dental, vision, disability, and life insurance through Lowe's but the coverage is not as comprehensive as the insurance available to full-time employees. Although she testified that her vision coverage is "great," she said her health insurance is

somewhat lacking because it only covers four office visits per year and does not cover lab work or emergency-room visits. Approximately 70% of her prescription costs are covered by her insurance at Lowe's, making her out-of-pocket expenses for medications roughly $20-$30 per month. The debtor testified that if she went to work at Lowe's on a full-time basis, she would be eligible for more comprehensive insurance coverage that would result in an additional $30 deduction from each check.

In addition to her part-time work at Lowe's, the debtor receives $175 per month in child support and also provides before and after-school care for three children–one of which is her nephew. The children are 5, 8, and 9 years old and, during the 40 school weeks per year, they are dropped off at the debtor's house at 6:30 a.m., five days per week. The debtor is paid $75 per week, per child, for a total weekly gross of $225–or $900 per month. The debtor uses approximately $200 of this amount for expenses associated with her childcare business. Specifically, she provides breakfast for the children, either making them food at her home or purchasing it at Daylight Donuts and other places. She also buys their after-school snacks and uses her gasoline to drive them to their respective schools in the morning and to their after-school activities in the afternoon. During the 12 weeks of summer, the debtor watches two of the children for full days: three days a week for six weeks and then four days a week for six weeks. For the three-day weeks, she charges a total of $150 and for the four-day weeks, she charges a total of $200. The debtor estimates that she spends a total of $25 per day on food for the children during the summer. After the debtor's expenses are deducted, she nets approximately $670 per month from her childcare business–which is significantly higher than the $100 per month that she listed on the amended budget she filed the day before trial.

In the amended budget, the debtor lists net income of $986 per month from Lowe's, $175 per month in child support, $450 to account for her annual tax refund, and $100 per month from her childcare business for a total of $1711 per month. However, based on her testimony, her actual income from her childcare business is about $670, which makes her total monthly income $2281. She lists her monthly expenses at $2526; however,

5

$700 of that figure is for "anticipated" expenses comprised of $300 for a car payment, $300 to "upgrade health insurance," $50 for vacations, and $50 for emergencies.

Of the debtor's anticipated expenses, the Court finds that it is likely that the debtor will need to replace her vehicle in the foreseeable future and will therefore leave the $300 deduction for a car payment in the debtor's budget.  Until she does buy a car, the debtor will have those funds available to make repairs to her existing vehicle, which the debtor estimates would cost around $500.  The Court also finds that $50 per month for emergencies is appropriate and will leave that deduction in place as well.  However, the Court does *not* find that the $300 deduction for upgraded health insurance is warranted for two reasons: first, the debtor made no indication at trial that she planned to obtain more expensive coverage and, second, the debtor could increase her hours at Lowe's to 38 per week and obtain full insurance coverage for a fraction of the estimated $300 per month–if she chose to do so.  Further, although the Court is sympathetic to the debtor's desire to take her daughter on vacations, a vacation is simply not a necessity that is appropriately deducted as an expense in an undue hardship analysis.  The Court finds that the remainder of the debtor's expenses appear to be necessary, reasonable, and commensurate with her current income level.  Based upon the Court's adjustments to the debtor's budget, her monthly expenses are $2176.  When her expenses are deducted from her monthly income of $2281, the debtor is left with a surplus of $105 per month.  This figure does not include the savings she could obtain by avoiding overdraft fees, which were over $470 for the seven-month period from February to August of this year, or by using regular gas instead of no-ethanol gas, as is her custom.

In addition to reviewing the debtor's current and future financial resources and expenses, courts in the Eighth Circuit must consider *all* relevant facts and circumstances in undertaking an undue hardship analysis.  *In re Jesperson*, 571 F.3d at 784.  Additional factors that may be relevant to a determination of undue hardship include, but are not limited to:
> (1) total present and future incapacity to pay debts for reasons not within

> the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

*Id.* (quoting *McLaughlin v. U.S. Funds* (*In re McLaughlin*), 359 B.R. 746, 750 (Bankr. W.D. Mo. 2007)). The Court will briefly discuss the factors applicable in this case.

First, the Court finds that the debtor's present and future incapacity to pay her student loan debt is entirely within her control. Although the Court found the debtor to be a credible witness and the Court believes that the debtor has been diagnosed with anxiety and depression, the debtor introduced no medical records or testimony to indicate that those conditions are permanent or make it impossible–or even inadvisable–for the debtor to work full-time. While the debtor testified that she believes that working full-time would result in the same problems that forced her to resign from Arvest, the Court simply has no medical evidence to support that supposition–and the evidence that the Court *does* have leads to a contrary conclusion. The debtor was successfully employed at Arvest for 17 years–14 of those as a full-time employee–with no apparent adverse effects upon the debtor's mental health until, after her last promotion, she had to work for a difficult boss–a problem specific to the particular job from which the debtor resigned in 2015, not to full-time employment in general. Further, the debtor testified that she could go back to work at Arvest now at a lower-level position. A lower-level position could possibly mean working under a different person than the one the debtor found intolerable in 2015–removing the only specific stressor at Arvest that the debtor identified at trial. Even if the debtor does not want to return to Arvest, she testified that Lowe's would hire her as a full-time employee and her 17-year tenure at Arvest would be an asset to her seeking employment elsewhere. Regardless, the debtor testified that she is not interested in taking advantage of those opportunities; she does not want to lose control over her

schedule because she wants to be available to spend time with her daughter and attend her extra-curricular activities, as well as to run errands for her father. The Court finds that the debtor has prioritized the flexibility of a part-time schedule over more lucrative full-time employment and–although the debtor's choice to spend more time with her family may be understandable to some extent–it is still *a choice,* and, by definition, within her control.

Second, the debtor made regular monthly payments on her student loan prior to voluntarily resigning from Arvest and is currently taking advantage of an income-based repayment program with a monthly payment of zero. While the debtor's eligibility for an income-based repayment program is not dispositive, it *is* a factor that weighs against the discharge of the debt. *In re Jesperson*, 571 F.3d at 781. At trial, the debtor acknowledged that the DOE offered the debtor an income-based repayment plan of $30 per month for some period of time, and if her financial circumstances fail to improve after the term of the agreement, the remainder of her loan would be forgiven. The debtor agreed at trial that she could afford to make a payment of $30 per month and, based upon her budgetary surplus of $105 per month, the Court finds that the payment would not impose an undue hardship upon the debtor. Also, the Court will state definitively that it disagrees with the debtor's contention that the Court must discharge a student loan debt if it appears on the day of trial that the debtor will be unable to afford to repay the entire amount of the debt without undue hardship. To the contrary, the Eighth Circuit has stated unequivocally that "a student loan should not be discharged when the debtor has the ability to earn sufficient income to make student loan *payments*" under an income-based program such as the one the debtor is participating in now and the one offered by DOE at trial. *See In re Jesperson*, 571 F.3d at 781 (emphasis added).

Third, the debtor's hardship is not long-term. As the Court has already discussed, the debtor apparently dealt with some work-related stress in 2015 that precipitated her resignation from Arvest. However, there is no evidence that the debtor's mental state is *presently* so fragile as to prevent her full-time employment, nor is there any medical

evidence to suggest that her depression and anxiety are permanent conditions. In fact, the only discernible cause of the debtor's current financial hardship is her choice to work part-time until her daughter graduates from high school–which will occur in four years. Therefore, the Court finds that the debtor's self-imposed financial hardship is not long-term.

Fourth, although the debtor obtained her degree in psychology, there is no evidence that she ever intended to pursue employment in that area. Rather, the debtor testified that she obtained her degree for one purpose–to attain promotions at Arvest. This purpose was accomplished. Therefore, the Court finds that her degree served the purpose for which she obtained it.

Finally, although the Court does not believe that the debtor's expenses are extravagant, the Court cannot find that the debtor has made a good faith effort to maximize her income because–as the Court has already discussed in detail–she is choosing to work part-time despite at least two readily available options for her full-time employment.

For these reasons, the Court finds that this debtor did not carry the rigorous burden of proving under the totality of the circumstances analysis required by the Eighth Circuit that the payment of her student loan debt would impose an undue hardship sufficient to discharge the debt under § 523(a)(8). Therefore, the Court denies the debtor's complaint and finds that the debt owed to DOE is nondischargeable.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated: 11/27/2017

cc: Forrest Stolzer
Erin R. Kemp
Deborah Groom
Seth Creed